Filed 4/24/26  P. v. Kessee CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAMUEL P. JACKSON and KEJON KESSEE,<br><br>    Defendants and Appellants. | B311352<br>(Los Angeles County<br> Super. Ct. No. TA146654) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael J. Shultz, Judge. Vacated and stricken in part with directions; Affirmed in part.

Gregory L. Rickard, under appointment by the Court of Appeal, for Defendant and Appellant Samuel P. Jackson.

Winston Kevin McKesson for Defendant and Appellant Kejon Kessee.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield, Supervising Deputy Attorney General, and William H. Shin and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

In May 2013, defendants Samuel Jackson and Kejon Kessee, both South Side Compton Crips gang members, drove into rival gang territory looking for someone to kill. Kessee spotted a man riding a bicycle and incorrectly identified him as a rival gang member. Jackson exited the vehicle and fatally shot the man. Defendants were tried together but before separate juries. Jackson's jury convicted him of first degree murder and found true gang and firearm allegations. Kessee's jury convicted him of second degree murder and likewise found true gang and gang-related firearm allegations. On appeal, defendants assert a long list of errors. The Attorney General concedes that the gang and gang-related firearm enhancements cannot stand, due to a change in the law, but disputes the remainder of defendants' contentions. We agree with the Attorney General.

# FACTUAL BACKGROUND

I.  *Prosecution Evidence Against Both Defendants*

    a.  *The Shooting*

On May 23, 2013, around 11:20 a.m., Alesha Palmer was washing dishes when she heard a gunshot. She looked out her kitchen window and saw that a young Black man, later identified as the victim, had been shot while riding his bike. Palmer also saw a "box-shaped dark gray square car." Palmer called the police and told the operator she heard "one loud shot." She also described the car as a gray "SUV-type truck."

Palmer later told the police that the car was "box-shaped, low to the ground, and dark smoke gray." The car was driving "casual," playing loud music, and did not speed off. Evidence set forth below indicated that the defendants were driving a Jeep Patriot at the time of the shooting. But when asked at trial if the car she saw was a Jeep, Palmer said it was "not quite as boxy."

Around 11:25 a.m., Deputy Esteban Rodriguez of the Los Angeles County Sheriff's Department (LASD) responded to the crime scene. At the scene, Deputy Rodriguez saw the victim lying on the street with a gunshot wound to his abdomen. The victim was straddling a black bicycle, with one leg under the bike and another leg over it. He was gasping for air but not

2

responsive.  There was a possible bullet strike mark on the gray stucco wall of a nearby building.  There was also a bullet fragment in the middle of the street.  The victim was transported to the hospital where he was pronounced dead at 11:53 a.m.  The autopsy revealed that the victim suffered a single fatal gunshot wound in his back.

### b.  *Testimony of Keyshawn Evans*[1]

At the time of the murder, both Evans and Jackson lived in a mobile home park called Del Amo Estates.  Defendants and Evans were members of the South Side Compton Crips.  The Neighborhood Compton Crips was a rival gang.  Evans testified that killing a rival gang member is one way of moving up to a higher rank in one's gang.

The day after the murder, May 24, 2013, Jackson asked Evans to meet him at the Del Amo Estates pool area.  Once there, Jackson told Evans about the shooting.  Jackson said Kessee picked him up in a rental car in the morning, right outside Del Amo Estates, and drove to a "rival enemy hood."  Kessee was driving and Jackson was in the front passenger seat.

Kessee saw someone he thought was "Ray-Ray" from the Neighborhood Compton Crips.  Kessee told Jackson the man was Ray-Ray.  When Jackson asked if he was sure, Kessee said yes.  Jackson got out of the car and shot the man once with a .44-caliber revolver.  Jackson did not want to shoot more than once because the firearm was loud and powerful.

---

[1]     In 2016, a jury convicted Evans of shooting at an inhabited dwelling and found true a gang allegation.  The jury hung on four other charges: one count of murder and three counts of attempted murder.  Shortly thereafter, Evans agreed to testify in the present case pursuant to a leniency agreement.  Under the agreement, Evans pled guilty to the one count of murder and the three counts of attempted murder.  He also pled guilty to an unrelated attempted murder charge as well as burglaries in another case.  If the presiding judge in the present case believed Evans testified truthfully, he would receive 15 years to life in state prison.  However, if the judge found he was not truthful, Evans would receive the maximum of 150 years to life in state prison.

### c. *The Investigation and Arrest*

Prior to the shooting, on May 17, 2013, Kessee dropped off his 2003 Chrysler Concord at the dealership for repairs. That day, Kessee's mother rented a gray Jeep Patriot and Keesee was listed as the secondary driver on the rental agreement.

On May 23, 2013, at 10:20 a.m., an automatic license plate recognition (ALPR) system camera caught the rental car near the shooting location. On May 31, 2013, Kessee returned the Jeep to the rental company.

On June 27, 2013, defendants were arrested. Sergeant Robert Gray and his partner interviewed Kessee. When Kessee was shown a photograph of the gray Jeep Patriot, he claimed he had never seen it before. Kessee also denied being involved in the shooting. Kessee called his mother from jail. In the recorded conversation, Kessee told his mother that he was arrested for murder. When his mother asked whether it was for a murder that occurred in Compton or Los Angeles, Kessee warned her that the conversation was being recorded. His mother then stated, "I'm asking you that . . . because the detective that called me is from a [Los Angeles] area code." Kessee confirmed it was Compton.

Jackson called his girlfriend from jail. She told Jackson the police already knew "everything." His girlfriend thought Kessee was talking to the police and that Kessee was "a fuckin' snake[,] I told you."

While in custody, the defendants were placed in a cell together and their conversation was recorded. Kessee stated, "They got no evidence." He then said, "They got the whip [(i.e., car)]. But they don't have a picture of us; me and you in the whip." Kessee reminded Jackson that there was no picture of him "being in the neighborhood . . . [o]n that day [of the shooting]." Jackson told Kessee, "Then we just gotta wait it out[,] [¶] . . . [¶] just don't say nothing." Jackson said, "Fucked up. I ain't banging the hood no more, bro." Both defendants were later released.

In July 2014, defendants and Evans were the subjects of a wiretap investigation. On July 8, 2014, Sergeant Gray left a crime flyer about the murder at Evans's house and another one at the workplace of Kessee's girlfriend to stimulate conversation about the murder. That day, a phone conversation was recorded between Evans and Jackson. They discussed the

flyer, and Evans told Jackson the flyer had the wrong car listed because defendants used a rental car and not Kessee's Chrysler at the time of the shooting. Evans also talked about "my boy" doing the shooting, referring to Jackson. The next day, Kessee had a conversation with his girlfriend. She told him, "[D]on't say nothing 'cause then you gonna look real stupid, because you're gonna be the one that said something."

        d. *Cell Phone Evidence*

Federal Bureau of Investigation Special Agent Michael Easter analyzed defendants' and Evans's cell phone data and was able to track their locations at a particular time by measuring signal strength from cell towers nearby. At trial, Agent Easter explained that a cell phone connects to the cell tower with the highest signal quality, which is not necessarily the tower closest to the phone.

On the morning of May 23, 2013, Jackson and Kessee called each other at 6:15 a.m., and again at 6:52 a.m. Evans and Jackson exchanged multiple text messages from 7:12 a.m. to 7:19 a.m. Throughout the morning, Jackson continued to communicate with Evans and Kessee. Both Jackson's and Kessee's phones eventually arrived in the area of the Del Amo Estates. At 10:20 a.m., Jackson called Kessee.[2] Jackson's and Kessee's phones continued moving through the same areas. At 11:06 and 11:25 a.m., Kessee's phone was likely near the crime scene. At 11:20 a.m., Jackson's phone received a call at or near the area of the crime scene. Between 11:44 a.m. and 11:48 a.m., both defendants' cell phones were still traveling near each other.

---

[2] As previously noted, the ALPR system time stamped the rental car near the crime scene at 10:20 a.m. Agent Easter opined that it was not possible for Kessee's phone to be in the rental car at that time because it was located approximately a mile away, which would be beyond the sector or coverage of the cell tower. However, Agent Easter conceded he was unaware if the ALPR system was "synced up" with cell service providers. In his experience, he had "worked plenty of cases where traffic cameras are typically not even synced with each other, let along synced to . . . the cellular network." Additionally, there are instances with the ALPR system "where the time stamp attributed to a given image is off," by "a few minutes at the most."

Based on the cell phone data, Special Agent Easter opined that on the day of the shooting, defendants' phones were together between 10:20 a.m. and 11:50 a.m. Based on the same data, Sergeant Gray opined that on the day of the shooting, Kessee's and Jackson's phones traveled to Del Amo Estates and then together to the crime scene.

### e. *Firearm Evidence*

Anny Wu, an LASD criminalist, examined the fired bullet recovered from the crime scene. Wu opined that the bullet was consistent with a .44-caliber Magnum cartridge and that based on this caliber of the bullet, the firearm used was most likely a revolver. The victim's DNA was found on the fired bullet.

### f. *Gang Evidence*

Detective Raul Ibarra testified as a gang expert. He identified defendants as members of the South Side Compton Crips. The South Side Compton Crips had approximately 130 members and 20 associates. Detective Ibarra described the boundaries of the gang's territory. He also testified that the gang's primary activities included narcotics sales, gun possession, robberies, burglaries, carjacking, murder, and shootings. The Neighborhood Compton Crips is a rival gang. Given a hypothetical based on the facts of this case, Detective Ibarra opined that the shooting was committed for the benefit of, at the direction of, or in association with the South Side Compton Crips.

### II. *Prosecution Evidence Against Kessee Only*

Terrence Harrison was a member of the South Side Compton Crips. In May 2013, Jackson called Harrison and asked for a gun but never told him what he was going to do with it. Harrison met up with Jackson in Compton and gave him a "long," "big," stainless steel revolver. Harrison later heard that someone had been killed and that the car used in the murder was caught on camera. He recalled seeing Kessee "all up in that car."

6

III. *Defense*

    a. *Kessee's Defense*

On May 23, 2013, Ruther Daniels was a code enforcement officer. He was driving in his patrol car when he heard three or four gunshots in front of him. Daniels continued to drive towards the direction of the gunshots and saw several people standing in the middle of the street with a body on the ground. Daniels approached and the victim was on the ground barely breathing.

Kessee's girlfriend testified that in July 2014, she went to work and her boss told her that a detective left a crime flyer. She later spoke with a police detective who told her that the flyer "had something to do with [Kessee]." She then called Kessee and told him about the flyer. She testified that her comment, "Don't say nothing," in the recorded conversation on July 9, 2014, referred to the fact that she was pregnant.

Kessee's mother testified about the phone call Kessee made to her while he was in police custody on June 27, 2013, when she asked whether the murder occurred in Los Angeles or Compton. Kessee's mother said she asked that question because Kessee was calling from a "323" telephone number. She admitted she rented a Jeep for Kessee while his car was getting repairs at the dealership.

## PROCEDURAL HISTORY

In September 2018, the Los Angeles County District Attorney's Office filed an information charging defendants with murder (Pen. Code, § 187, subd. (a)).[3] The information also alleged principal use of a firearm (§ 12022.53, subds. (b)-(d), (e)(1)), and personal use of a firearm by Jackson (§ 12022.53, subds. (b)-(d)). Finally, the information included gang allegations (§ 186.22, subd. (b)(1)(C)).

After a jury trial, Jackson was found guilty of first degree murder, with true findings on the firearm and gang allegations. The jury found Kessee not

---

[3]    All further statutory references are to the Penal Code unless otherwise stated.

guilty of first degree murder but deadlocked as to the lesser included charge of second degree murder. The trial court declared a mistrial as to Kessee.

A second jury trial was held on the charges against Kessee; the jury again deadlocked on the second degree murder charge, and the trial court again declared a mistrial. Shortly thereafter, the court granted Jackson's motion for a new trial based on a finding that the prosecution withheld exculpatory material, described in more detail below, in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). The People then tried defendants together again, but with two separate juries.

On March 6, 2020, Jackson's jury found him guilty of first degree murder (§ 187, subd. (a)), with true findings on the gang allegation (§ 186.22) and three firearm allegations (§ 12022.53, subds. (b)-(d)). The trial court sentenced Jackson to 25 years to life for the murder, plus 25 years for the firearm enhancement (§ 12022.53, subd. (d)), for a total of 50 years to life in state prison. The court stayed the gang enhancement as well as the remaining firearm enhancements.

Kessee's jury found him guilty of second degree murder (§ 187, subd. (a)), with true findings on the gang allegation (§ 186.22) and three gang-related firearm allegations (§ 12022.53, subds. (b)-(d), (e)(1)). The trial court sentenced Kessee to 15 years to life for the murder, plus 25 years for one gang-related firearm enhancement (§ 12022.53, subds. (d), (e)(1)), for a total of 40 years to life in state prison. The court stayed the gang enhancement as well as the remaining gang-related firearm enhancements.

Defendants timely appealed.

## DISCUSSION

I. *Brady Violation*

Jackson argues that his conviction must be reversed and the charges against him dismissed because the *Brady* violation amounted to outrageous government misconduct. We disagree.

8

a. *Relevant Background*

During Kessee's second trial, Sergeant Gray testified that the police used a "StingRay"[4] to locate Kessee's cell phone. He stated that another detective (later identified as Detective Kasey Woodruff) wrote the StingRay search warrant. Kessee's counsel informed the trial court that he was not aware of the StingRay search warrant and that no information about this warrant was disclosed in discovery. The court ordered, and Sergeant Gray provided, a copy of the warrant for defense counsel. As relevant here, Detective Woodruff attested in the affidavit accompanying the warrant that during the week of June 2, 2013, through June 9, 2013, a confidential informant (CI) spoke to Kessee, and Kessee told the CI that "he shot and killed the victim."

After reviewing the warrant, Jackson moved to set aside his guilty verdict from the first trial and dismiss the case against him. Jackson claimed the warrant contained materially exculpatory evidence, specifically Kessee's purported admission to being the shooter. Alternatively, Jackson sought a new trial based on the People's failure to disclose this exculpatory information (§ 1181) and requested disclosure of the CI's identity. The People opposed the motion. The People filed the audio recording and transcript of Sergeant Gray's May 31, 2013 interview with the CI, under seal.

At the hearing, Sergeant Gray testified that on May 31, 2013, he interviewed the CI with Detective Woodruff. The CI said defendants were responsible for the victim's murder. The CI believed Kessee was the driver and Jackson was the shooter. The CI claimed the weapon used was a .44-caliber firearm with a scope and defendants were in a gray Jeep at the time. The CI did not indicate that Kessee was the shooter or acting alone. When asked to disclose the CI's identity, Sergeant Gray asserted the privilege created by Evidence Code sections 1040, 1041, and 1042. Sergeant Gray

---

[4]    A StingRay, also known as a cell-site simulator, " 'is a device that locates cell phones by mimicking the service provider's cell tower (or "cell site") and forcing cell phones to transmit "pings" to the simulator. The device then calculates the strength of the "pings" until the target phone is pinpointed.' [Citation.]" (*People v. Johnson* (2019) 32 Cal.App.5th 26, 63, fn. 13.)

explained the CI would likely be killed if his or her identity was known. Sergeant Gray testified that he first obtained a copy of the StingRay warrant during Kessee's second trial.

Detective Woodruff also testified at the hearing. He confirmed he was present when the CI indicated defendants were responsible for the shooting. When asked to explain his statement in the affidavit, Detective Woodruff testified that the CI said "they did it" during the interview. According to Detective Woodruff, the CI elaborated that, "Kessee was—he referred to them as 'we,' that they did it, that they did it." Because the StingRay warrant was only for Kessee's phone, Detective Woodruff intentionally omitted Jackson from the affidavit. The CI never told Detective Woodruff that Kessee acted alone. The trial court ordered the People to provide the defense with a redacted version of the CI interview transcript.

The trial court found Detective Woodruff's statement in the affidavit was exculpatory "on [its] face" as to Jackson and "the plain reading of it is that Kessee was the shooter in this case." In addition, the court found that this evidence was material within the meaning of Evidence Code section 1040. The court explained that Detective Woodruff's statement was "material with respect to whether or not Mr. Jackson personally used the firearm." The court then held an in-camera hearing with the prosecution to discuss what information should be disclosed to defense. After the hearing, the court stated it was inclined to grant Jackson's request to disclose the CI's identity but gave the prosecution time "to figure out how to make th[e] disclosure[] in the most significant manner and without jeopardizing anybody's safety." The court put off ruling on Jackson's motion for a new trial.

The People filed a supplemental opposition to the disclosure of the CI's identity and to Jackson's motion for a new trial under section 1181. The People also provided a further revised transcript of the CI interview to the defense.

At the continued hearing, the court invited Jackson's counsel to argue the motion for a new trial. After argument, the court again found Detective Woodruff's statement in the affidavit materially exculpatory "on its face" because it directly implicated Kessee as the shooter, which was contrary to

10

the jury's finding that Jackson personally used a firearm. The court did not believe Detective Woodruff's testimony led to a different result. The court concluded that his statement in the affidavit was negligent but did not reach the level of "a reckless disregard for the truth." The court noted that Detective Woodruff should have referenced both defendants by writing "they" killed the victim, rather than stating that Kessee or "he" did it.

In assessing the reasonable probability that the statement in the affidavit would have affected the outcome of the trial, the court believed that "ultimately the [CI's] information . . . is inculpatory to Mr. Jackson, [and] in the end it will hurt him." However, the court found that the prosecution's failure to disclose the statement in the StingRay warrant injected other problematic issues into Jackson's trial. The court explained the CI was a material and percipient witness and their statements in the May 31, 2013 interview contradicted Harrison's testimony in a significant way. The CI stated that defendants told Harrison "what it [was] they intended to do" and asked him "for a firearm so that they could complete their mission." The CI personally witnessed this exchange. The CI's statements conflicted with Harrison's testimony at trial. Harrison denied any knowledge of what defendants were going to do with the firearm. Thus, the CI could impeach Harrison's testimony. The court found "[t]hat [this] impeachment [evidence] arguably . . . would have made [Harrison] an accomplice as a matter of law." The court also noted that Sergeant Gray knew the CI's statements conflicted with Harrison's testimony but did not disclose this information.[5] The court found that the failure to disclose the CI's conflicting statements to defense affected Sergeant Gray's credibility. Thus, the *Brady* violation had "a cascading effect" that was clearly "problematic." The court concluded there was a reasonable probability of a different result "given the fact that Ms. Palmer was so unequivocally clear that [the shooter's vehicle] was not a Jeep," and granted the motion for a new trial.

The trial court then turned to the issue of disclosing the CI's identity. The court stated that the question was whether the CI's identity was "material to the issues of innocence or guilt." Again, the court found the CI

---

[5]    The court found, however, that Sergeant Gray did not withhold this information "to gain a calculated advantage."

11

was a material and percipient witness. Therefore, the court ordered the People to disclose the identity of the informant as well as a full, unredacted transcript of the CI's interview.

The People later informed the trial court that they would not disclose the CI's identity. In response, the court held a hearing on the prosecution's failure to comply. At the outset, the court found that LASD's privilege had been properly claimed, but that nondisclosure of the CI's identity would deny Jackson a fair trial. The court declined Jackson's request to dismiss the case against him because it would be contrary to the interests of justice given the ample evidence that he committed the murder. The court also denied Jackson's request to exclude or limit Evans's testimony as it was completely unrelated to the initial *Brady* violation and to the disclosure of the CI's identity. The court further denied Jackson's request to exclude the wiretaps and for a jury instruction that Sergeant Gray failed to disclose *Brady* information. The court noted that the requested jury instruction was "a trial issue" and therefore defense could later seek to request it at trial.

Pursuant to Evidence Code section 1042,[6] the court ordered that Detective Woodruff's statement in the affidavit would be admissible at Jackson's trial, and Harrison's testimony would be excluded. However, the court denied the defense request to "preclude rehabilitation or rebuttal" as to Detective Woodruff's statement, because that would be contrary to Evidence Code section 1202.[7] The court noted that these orders did not apply to Kessee.

---

[6] Evidence Code section 1042, subdivision (a) states that "if a claim of privilege under this article by the state or a public entity in this state is sustained in a criminal proceeding, the presiding officer shall make such order or finding of fact adverse to the public entity bringing the proceeding as is required by law upon any issue in the proceeding to which the privileged information is material."

[7] Evidence Code section 1202 provides: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent

12

b. *Analysis*

Jackson asserts that, to remedy the *Brady* error, the trial court should have dismissed this case, rather than granting him a new trial. Whether we review the issue independently or for abuse of discretion, we conclude the trial court correctly denied the motion. (Compare *People v. Uribe* (2011) 199 Cal.App.4th 836, 857 (*Uribe*) [independently reviewing the trial court's granting of a motion to dismiss for outrageous government misconduct on remand after appellate reversal for *Brady* error] with *People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 445 [reviewing motion to dismiss for prosecutorial misconduct for abuse of discretion] and *People v. Jenkins* (2000) 22 Cal.4th 900, 951 (*Jenkins*) [recognizing that "courts have broad discretion in determining the appropriate sanction for discovery abuse"].)

"Pursuant to [*Brady*], and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence." (*People v. Harrison* (2017) 16 Cal.App.5th 704, 709.) " 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.) It is undisputed that the prosecution's belated disclosure of the StingRay warrant, which contained material exculpatory evidence, constituted a *Brady* violation.

When the prosecution has committed a *Brady* violation, the trial court has discretion to determine an appropriate remedy to ensure the defendant receives a fair trial. (See *People v. Fultz* (2021) 69 Cal.App.5th 395, 432 (*Fultz*) [after affirming the trial court's findings of *Brady* error and other prosecutorial misconduct, remanding the case to the trial court "because it is in the best position to fashion a remedy adequate to ensure defendant's fair trial"]; see also *Jenkins, supra*, 22 Cal.4th at p. 951.) Although a new trial is usually the most serious remedy for a *Brady* violation, additional or

statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

13

alternative remedies may be necessary where a new trial, by itself, will not ensure a fair trial. (See *People v. Kasim* (1997) 56 Cal.App.4th 1360, 1382, 1387 (*Kasim*); *Virgin Islands v. Fahie* (3d Cir. 2005) 419 F.3d 249, 254–255.) For example, outright dismissal may be appropriate in *Brady* cases where a fair trial is impossible due to the prosecution's "gross and intentional" misconduct. (*People v. Garcia* (1993) 17 Cal.App.4th 1169, 1183; see *Fultz, supra*, at p. 431; see also *People v. Ramirez* (2006) 141 Cal.App.4th 1501, 1503, fn. 1 [recognizing that "bad faith *Brady* errors may warrant dismissal"]; *Uribe, supra*, 199 Cal.App.4th at p. 841 ["A court may dismiss an information in an extreme case to address outrageous governmental conduct"]; *Jenkins, supra,* at p. 951 [recognizing that "appropriate" sanctions for the prosecution's suppression of evidence may include dismissal].) Section 1054.5, subdivision (c), which addresses sanctions for discovery violations in a criminal case, similarly recognizes the "judicial power to dismiss charges for a *Brady* violation." (*People v. Gutierrez* (2013) 214 Cal.App.4th 343, 352.)

Nevertheless, "[d]ismissal of charges is an extraordinary remedy . . . reserved for the few cases where conduct by the prosecution has completely eliminated the possibility of a fair retrial." (*Kasim, supra*, 56 Cal.App.4th at p. 1387; see *United States v. Pasha* (D.C. Cir. 2015) 797 F.3d 1122, 1139 ["dismissal is appropriate only as a last resort, where no other remedy would cure [the] prejudice against a defendant" caused by a *Brady* violation]; *Mendibles v. Superior Court* (1984) 162 Cal.App.3d 1191, 1198 ["lesser sanctions must be utilized by the trial court," in lieu of dismissal, "unless the effect of the prosecution's conduct is such that it deprives defendant of the right to a fair trial"].)

Jackson's argument for dismissal rests on the premise that there "appear[ed] to be a pattern of recurring [*Brady*] violations," which amounted to "outrageous government conduct." Although the trial court found only one *Brady* violation, the prosecution's belated disclosure of the StingRay warrant, Jackson maintains that a further *Brady* violation occurred. Specifically, Jackson argues Sergeant Gray failed to disclose the CI's statements during the May 31, 2013 interview, which would have impeached Harrison's credibility.

14

Even assuming (without deciding) this constituted an additional *Brady* violation, we are not persuaded that dismissal would be justified. Jackson does not assert on appeal that the *Brady* violations were intentional or committed in bad faith, nor would the record support such a conclusion. In fact, the violations might not have been committed knowingly at all. The trial court found nothing to show that the prosecution intentionally withheld evidence. It found that Sergeant Gray did not withhold the CI information "to gain a calculated advantage." Finally, the trial court found dismissal of the case contrary to the interests of justice given the ample evidence that Jackson committed the murder.

Accordingly, we conclude that the appropriate remedy for the *Brady* violation was a new trial, which is precisely what Jackson received.

II.     *Disclosure of Confidential Informant's Identity*

LASD, through Sergeant Gray, refused to disclose the CI's identity, asserting privilege under Evidence Code section 1041, which permits a public entity to refuse to disclose the identity of an informer when disclosure "is against the public interest because the necessity for preserving the confidentiality of his or her identity outweighs the necessity for disclosure in the interest of justice." After sustaining the claim of privilege, the trial court held a hearing to determine the appropriate remedy pursuant to Evidence Code section 1042. The court denied Jackson's request to dismiss the case but issued the orders against the prosecution detailed above.

On appeal, Jackson contends the adverse orders issued by the trial court were insufficient to ensure him a fair trial. We review the trial court's ruling for abuse of discretion. (*People v. Bradley* (2017) 7 Cal.App.5th 607, 621.)

"The purpose of compelling disclosure of an informant who is a material witness on the issue of guilt, and of the remedy of dismissal if the People invoke confidential privilege, is to assure the defendant a fair trial on the offense charged. However, the trial court's orders should go no further than necessary to protect the defendant's right to a fair trial. (*People v. Superior Court* (1971) 19 Cal.App.3d 522, 533–534.)" (*People v. Borunda* (1976) 58 Cal.App.3d 368, 375.)

15

Here, the trial court ordered the admission of Detective Woodruff's statement in the affidavit that Kessee admitted to the CI that he was the shooter. This allowed Jackson to present evidence that contradicted his own admissions to Evans that he was the shooter and Kessee was the driver. Because Detective Woodruff's statement could be used to undercut Evans's credibility, it was not necessary to exclude Evans's testimony in its entirety as Jackson suggested. Further, Jackson's request to exclude any evidence that contradicted Detective Woodruff's statement would overcorrect the *Brady* error and unfairly tip the scales in his favor. The court also ordered Harrison's testimony excluded in its entirety against Jackson, which prevented the prosecution from using it to prove Harrison provided Jackson with the murder weapon.

The court's denial of the request to instruct the jury that Sergeant Gray failed to disclose favorable evidence to the defense did not render the trial fundamentally unfair. We note that the court invited the defense to request this instruction at trial. It does not appear from the record that defense made such a request. Moreover, as the court pointed out, dismissal would be contrary in every respect to the interests of justice, because there was ample evidence Jackson committed the murder. Therefore, we conclude the trial court issued an appropriate remedy to ensure Jackson's right to a fair trial in light of the prosecution's refusal to disclose the CI's identity.

Jackson contends the prosecution's refusal to disclose the CI's identity amounted to a *Brady* violation because the CI could have been used to impeach Evans's testimony that Jackson admitted to being the shooter. Jackson is essentially repackaging the argument that Detective Woodruff's statement in the affidavit was materially exculpatory and therefore its suppression constituted a *Brady* violation. We agree that the delayed disclosure of this evidence was a *Brady* violation. But we reject Jackson's attempt to assert multiple *Brady* violations for the same underlying evidence. The nondisclosure of the CI's identity is a wholly separate issue and more appropriately analyzed in the context of Evidence Code section 1042, as discussed above.[8]

---

[8] Jackson asserts for the first time on appeal that Sergeant Gray and other detectives tampered with evidence through coaching witnesses.

16

Jackson requests that this court independently review the sealed transcript of the in camera hearing on the disclosure of the CI's identity. The Attorney General does not oppose this request. We have independently examined the transcript of the court's in camera hearing, and find the record is adequate for appellate review. We discern nothing in the in camera proceedings that meaningfully affects the issues raised on appeal. [9]

III.    *Motion to Suppress*

Kessee moved to traverse the StingRay warrant, dated June 20, 2013, and to suppress all evidence obtained as a result of his subsequent arrest on June 27, 2013. Kessee argues the trial court abused its discretion in denying the motion. Jackson joins in the argument.

a.   *Relevant Background*

In his motion, Kessee contended that the prosecution admitted Detective Woodruff made material misrepresentations in his affidavit, specifically about the CI's statements pertaining to the identity of the shooter. The People opposed the motion, arguing that no suppression was required because "Detective Ibarra independently obtained a separate *Ramey*

---

Because Jackson did not present this issue to the trial court, it is forfeited on appeal. (See *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591–592 ["arguments raised for the first time on appeal are generally deemed forfeited"]; *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["The purpose of this [forfeiture] rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected"].)

[9]    Kessee contends that the trial court violated his "state and federal due process rights when it did not dismiss the case upon the prosecution's refusal to turn over *Brady* information." As discussed above, the *Brady* evidence at issue was exculpatory for Jackson only because the CI implicated Kessee as the shooter. Kessee further contends the trial court erred in failing to dismiss "the case" when the prosecution refused to disclose the identity of the CI. While Kessee filed a motion to disclose the CI's identity, he subsequently withdrew it. Accordingly, we do not address Kessee's arguments pertaining to the *Brady* violation or the prosecution's failure to disclose the CI's identity.

17

warrant[10] for . . . Kessee's arrest on June 26, 2013." The prosecutor provided the trial court with a sealed copy of Detective Ibarra's warrant. The prosecutor also provided the defense with a redacted copy of Detective Ibarra's affidavit.

Kessee made an oral motion to disclose the identity of the CI discussed in Detective Ibarra's affidavit and to traverse the related warrant. Jackson joined in the motion. The prosecutor requested an in camera hearing with Detective Ibarra to review his affidavit for the search warrant. After the in camera hearing, the court denied defendants' motion to disclose Detective Ibarra's CI or to provide an unredacted version of the detective's affidavit.

A few days later, the trial court held a hearing on Kessee's motion to traverse the StingRay warrant and to suppress all evidence obtained as a result of his arrest. After argument, the court granted the motion to traverse the StingRay warrant. The court found Detective Woodruff's statement about the CI's identification of the shooter was "clearly a negligent disregard for the truth," because by his own admission, the conversation between the CI and Kessee detailed in the affidavit never occurred. However, the court denied Kessee's motion to suppress evidence obtained following his arrest because Detective Ibarra's warrant provided an independent basis for Kessee's arrest, search of his person, "and many, many other things, including locations." In doing so, the court also denied defendants' motion to traverse Detective Ibarra's warrant. The court reasoned that Detective Ibarra's in camera testimony was credible and there was "nothing about the warrant that [was] even remotely false." The court further found Detective Ibarra's redacted affidavit contained "acceptable disclosures, meaning that no further disclosures are necessary."

b. *Analysis*

The trial court did not abuse its discretion in denying Kessee's motion to suppress because the evidence was obtained after his arrest from a source independent of the unlawful StingRay warrant.

---

**10**     A *Ramey* warrant is a warrant authorizing a residential arrest of a suspect before the filing of criminal charges. (*Goodwin v. Superior Court* (2001) 90 Cal.App.4th 215, 218, citing *People v. Ramey* (1976) 16 Cal.3d 263.)

Under the independent source doctrine, the exclusionary rule will not be applied if tainted evidence is also obtained through a source that is wholly independent of a constitutional violation. (See *Nix v. Williams* (1984) 467 U.S. 431, 443; *People v. Weiss* (1999) 20 Cal.4th 1073, 1081; *People v. Tousant* (2021) 64 Cal.App.5th 804, 818.) "The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. [Citations.] When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." (*Nix v. Williams, supra*, at p. 443, fn. omitted.)

The independent source here was Detective Ibarra's search warrant, which was dated one day prior to the arrest. On appeal, Kessee posits that the arresting officer had no knowledge of Detective Ibarra's warrant prior to his arrest. We reject Kessee's assertion as he provides no record citation to support it. Moreover, the trial court found Detective Ibarra credible and found nothing about the warrant even "remotely false."

Kessee further contends that all the evidence obtained as a result of his arrest should have been suppressed because Detective Woodruff lied to obtain the StingRay warrant and such flagrant misconduct must be deterred. We disagree with Kessee's characterization of Detective Woodruff's conduct. While the trial court found that Detective Woodruff acted with negligent disregard for the truth, it did not find intentional deception. As discussed, the *Brady* violation was already remedied by the trial court ordering a new trial. No further remedy was warranted. Because Detective Ibarra's warrant provided an independent source for the discovery of evidence, the trial court acted within its discretion in denying Kessee's request to suppress all evidence obtained after his arrest.

Defendants request that this court independently review the sealed transcript of the in camera hearing on Detective Ibarra's search warrant to determine whether it identified Kessee's location. We decline to do so. The issue presented is whether Detective Ibarra's search warrant supplied

19

independent legal authorization to arrest and search Kessee and his property. It is irrelevant to our analysis that the StingRay device was utilized to locate Kessee to effectuate his arrest and the Ramey search warrant allegedly was not.[11]

IV.   *Admission of Jackson's statements to Evans Against Kessee*

Kessee argues the trial court prejudicially erred in admitting Jackson's statements to Evans regarding defendants' participation in the shooting. Kessee claims the statements were hearsay and inadmissible under Evidence Code section 1230 as a declaration against interest and asserts that admitting the statements violated his right to confrontation under the Sixth Amendment. We disagree.

a. *Relevant Background*

Prior to trial, Kessee filed a motion in limine to exclude Jackson's conversation with Evans about defendants' involvement in the shooting. The trial court denied the motion.

The trial court found that admission of Jackson's statements did not implicate the Confrontation Clause because the statements were not testimonial. The court further found Jackson's statements admissible under Evidence Code section 1230 as a declaration against interest. The court reasoned Jackson was unavailable, and "the bulk of his statement [was] disserving to his own interests." The court went on to explain that defendants are friends and in the same gang. Jackson's report of the crime to Evans was "consistent with the People's theory that both of the defendants wanted to make a name for themselves [and] show their allegiance to the

_____

[11]    Kessee further contends the trial court abused its discretion in denying the motion to traverse Detective Ibarra's warrant without providing defense an unredacted version of the warrant. We agree with the Attorney General that this is a conclusory assertion of error without any citation to legal authority. Therefore, we decline to consider it. (*People v. Mayfield* (1993) 5 Cal.4th 142, 196 (*Mayfield*) [defendant's claims "largely are asserted perfunctorily and without argument in support"]; *People v. Hardy* (1992) 2 Cal.4th 86, 150 (*Hardy*).)

gang by committing . . . the most serious violent crime one can commit."  The court continued, "The circumstances under which [the statements] were uttered [are] clear that . . . Jackson thought he was in a safe place, . . . uttering a crime to a fellow gang member[, (Evans)]."  While Jackson implicated himself in the murder, he did not attempt to shift blame to Kessee.

   b.  *Declaration Against Interest Exception*

"Although hearsay statements are generally inadmissible as evidence (Evid. Code, § 1200, subd. (b)), California law recognizes several exceptions to this rule."  (*People v. Jasso* (2025) 17 Cal.5th 646, 668 (*Jasso*).)  Evidence Code section 1230 provides an exception for statements against interest: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . , that a reasonable man in his position would not have made the statement unless he believed it to be true."

To demonstrate that the hearsay statement is admissible as a declaration against interest, the proponent of the declaration must show that the declarant is unavailable,[12] that the declaration was against the declarant's interest when made, and that the declaration was sufficiently reliable.  (*Jasso, supra*, 17 Cal.5th at p. 668.)  To determine whether a statement is against the declarant's interest, the trial court looks at the effect of the statement as a whole and considers the circumstances under which the statement was made, in addition to the words used.  (*Ibid.*)  We review a trial court's application of Evidence Code section 1230 for abuse of discretion.

[12]   Evidence Code section 240, subdivision (a)(1), defines "unavailable as a witness" to mean the declarant is "[e]xempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant."  "One such privilege, the exercise of which makes a person unavailable as a witness, is the constitutional privilege against self-incrimination."  (*People v. Cudjo* (1993) 6 Cal.4th 585, 616.)  It is undisputed that Jackson was "unavailable as a witness" under Evidence Code section 240.

(*Jasso, supra*, 17 Cal.5th at p. 669; *People v. Grimes* (2016) 1 Cal.5th 698, 711–712.)

Jackson's statements to Evans fall squarely within this exception. Jackson incriminated himself in a murder that had occurred the day before. Any reasonable person in Jackson's position would not have exposed his direct participation unless he believed it to be true.

Kessee argues that the statements were not made against Jackson's interest because he "shift[ed] the ultimate blame" to Kessee. (See *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 [the content of a declarant's statement "is most reliable in th[e] portion that inculpates" him or her, and "[i]t is least reliable in that portion which shifts responsibility"].) We disagree. Jackson was bragging when he spoke to Evans. Jackson said he was picked up by Kessee and together they decided to go to look for a rival gang member to shoot. Jackson was the one carrying the firearm that he obtained from a fellow gang member. After Kessee incorrectly identified the victim as a rival gang member, it was Jackson who got out of the car and fatally shot the victim. Jackson's statements equally inculpate him and Kessee in the murder. Jackson in no way minimizes his role or shifts the bulk of responsibility to his cohort.

In addition, the circumstances demonstrated the statements' reliability. The statements were "volunteered to an acquaintance" (*People v. Samuels* (2005) 36 Cal.4th 96, 121), Jackson's friend and fellow gang member, Evans. It was therefore made in "the most reliable circumstance[,] . . . one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures," rather than "the least reliable circumstance[,] . . . one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others." (*People v. Greenberger, supra,* 58 Cal.App.4th at p. 335.)

For these reasons, we conclude the trial court did not abuse its discretion when it admitted Jackson's statements to Evans as a declaration against interest.

c. *Confrontation Clause*

The admission of testimonial statements by a nontestifying witness without a prior opportunity for cross-examination violates the defendant's right to confrontation under the Sixth Amendment. (*Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*).) This right to confrontation "bars the admission at trial of a testimonial out-of-court statement against a criminal defendant unless the maker of the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination." (*People v. Lopez* (2012) 55 Cal.4th 569, 580–581; accord, *Crawford, supra*, at p. 68.) A testimonial statement has two critical components. "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution."[13] (*People v. Dungo* (2012) 55 Cal.4th 608, 619.) Jackson's statements bear none of these characteristics. The statements lacked any degree of formality and solemnity as they were made in a casual setting to a fellow gang member. It is settled that such " 'informal statement[s] to a person not affiliated with law enforcement,' fall outside the scope of the confrontation clause, which is concerned with 'formal and solemn accusatory statements . . . in the context of criminal investigations or inquiries.' [Citations.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1065–1066; see also *People v. Maciel* (2013) 57 Cal.4th 482, 527 [statements made to fellow gang members not testimonial].)

Accordingly, because Jackson's statements cannot be deemed testimonial, there was no Sixth Amendment confrontation clause violation.

V.    *Murder Convictions*

Defendants contend that there was insufficient evidence to support their murder convictions. We disagree. There was substantial evidence to support Jackson's first degree murder conviction and Kessee's second degree murder conviction as an aider and abettor.

---

[13]    Our Supreme Court has noted that " '[a] comprehensive definition of the term "testimonial" awaits articulation' " by the United States Supreme Court. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 398.)

23

a. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] This determination 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Cardenas* (2025) 18 Cal.5th 797, 821.) " 'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' [Citation.] We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

b. *Legal Principles*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) First degree murder includes the additional elements of premeditation and deliberation. (*People v. Knoller* (2007) 41 Cal.4th 139, 151; § 189 [degrees of murder].) A decision to kill is premeditated if considered beforehand and deliberate if resulting from careful thought and weighing of competing considerations. (*People v. Lee* (2011) 51 Cal.4th 620, 636.) Second degree murder is an unlawful killing with malice, but without premeditation or deliberation. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

"Guilt as an aider and abettor is guilt 'based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental

24

state.' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 710.) "A person aids and abets the commission of a crime when [the person], (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

    c. *Analysis*

We conclude that there was ample evidence to support defendants' murder convictions. Defendants were South Side Compton Crips gang members and the Neighborhood Compton Crips was their rival gang. Defendants drove into rival gang territory with the purpose and intent of killing a Neighborhood Compton Crips gang member. Kessee facilitated the killing by identifying the victim as such a person, albeit incorrectly. Jackson, already armed, exited the vehicle and fatally shot the victim in the back before fleeing the scene. Palmer testified she heard a gunshot and then saw a "box-shaped gray" car driving away. Kessee's mother had rented a silver Jeep Patriot prior to the shooting and Kessee was listed as a secondary driver on the rental agreement. The same vehicle was captured by an ALPR camera system driving near the crime scene approximately an hour before the shooting. In reconciling the different locations of Kessee's cell phone and the rental vehicle, Agent Easter opined that the ALPR system could have been a few minutes off. Moreover, defendants' cell phone data put them both at the crime scene at the time of the shooting, as well as their travel to and from the crime scene.

In addition, Evans testified that Jackson bragged about how he had committed the murder together with Kessee. Specifically, Jackson said that Kessee picked him up on the morning of the shooting and they decided to drive together to rival gang territory. Kessee was driving and Jackson was in the front passenger seat. While driving through rival gang territory, Kessee mistakenly identified a person on a bicycle as a rival gang member. Kessee stopped the car and Jackson got out and fatally shot the victim at point blank range. Kessee's jury heard from Harrison, another South Side Crips gang member, who testified that in May 2013 he gave Jackson a "long," "big,"

25

stainless steel revolver. Reviewing the entire record in a light most favorable to the judgment, there was substantial evidence to support the findings that Jackson committed first degree murder and Kessee committed second degree murder as an aider and abettor.

On appeal, defendants in essence ask this court to reweigh the evidence and make credibility determinations. While defendants concede that they were "together on the day of the murder and in the area of it," they contend that is not enough. Defendants further argue that the recorded jail conversation between them was mostly (but not completely) "inaudible" and "unintelligible," and that the wiretapped phone calls did not inculpate defendants in the murder. Next, defendants attack the credibility of Evans's testimony based on alleged inconsistent statements and his leniency agreement with the prosecution. Lastly, defendants point out that Palmer denied the vehicle she saw after the shooting was a Jeep.

We do not parse through these contentions because weighing the evidence and judging the credibility of witnesses fall within the jury's province. (*People v. Maury* (2003) 30 Cal.4th 342, 403.) The jury clearly believed the version of events as presented by the prosecution, with Evans as the key witness, and rejected the version presented by defendants. The fact that evidence presented at trial might also support a conclusion contrary to the one the jury reached does not mean the evidence is insufficient to support the conclusion the jury did reach. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

VI.    *Assembly Bill No. 333*

Assembly Bill No. 333 (AB 333), which amended section 186.22, was enacted in 2021 and became effective on January 1, 2022. (*People v. Burgos* (2024) 16 Cal.5th 1, 7 (*Burgos*); *People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207 (*Tran*).) Defendants contend, and the Attorney General agrees, that the amendments AB 333 made to section 186.22 apply retroactively to their case. We agree with the parties that the substantive amendments to section 186.22 are retroactive and require us to vacate the jury's findings on the gang allegations and gang-related firearm allegations. We remand the matter to

afford the prosecution the opportunity to retry these allegations, should it choose to do so.

AB 333 added " 'new elements to the substantive [gang] offense and [gang] enhancements in section 186.22—for example, by requiring proof that gang members "collectively engage" in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and underlying offenses provided more than a reputational benefit to the gang. . . .' [Citations.] These changes ha[d] the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement.' " (*Tran, supra*, 13 Cal.5th at p. 1207; *Burgos, supra*, 16 Cal.5th at p. 9; *People v. Clark* (2024) 15 Cal.5th 743, 749.)[14]

The parties agree, and our Supreme Court has held, that these changes ameliorate punishment and thus apply retroactively to all cases not yet final as of the statute's January 1, 2022 effective date. (See *Tran, supra*, 13 Cal.5th at pp. 1206-1207, citing *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).) "When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran, supra*, 13 Cal.5th at p. 1207.) Here, the Attorney General concedes reversal is required, reasoning that the evidence presented at trial failed to establish that the predicate offenses commonly benefitted the gang in a way that was more than merely reputational, as required by the newly amended section 186.22. We agree. On this record, reversal of the gang enhancements

---

[14] In addition to amending section 186.22, AB 333 added section 1109, which requires that the trial of a gang enhancement charged under section 186.22, subdivision (b), be bifurcated from and follow trial of the underlying offenses when requested by the defendant. (§ 1109, subd. (a); *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129, disapproved of on other grounds in *Burgos, supra,* 16 Cal.5th at p. 31.) AB 333's enactment of section 1109 became effective almost two years after defendants' trial. Kessee concedes section 1109 is not retroactive and therefore does not apply. (See *Burgos, supra,* 16 Cal.5th at p. 7.)

is required, and the prosecution must be given the opportunity to establish the additional elements on remand, should it choose to do so. (See *People v. Eagle* (2016) 246 Cal.App.4th 275, 280.)

The same rationale applies to the jury's findings on the section 12022.53, subdivision (e)(1) firearm allegations, which require findings under section 186.22, subdivision (b). (See *People v. Lopez, supra,* 73 Cal.App.5th at pp. 346-348.) Section 12022.53, subdivision (e)(1) provides for enhanced firearm penalties for "any person who is a principal in the commission of an offense" if the prosecution pleads and proves that (1) the person violated section 186.22, subdivision (b), and (2) any principal in the offense committed a firearm violation specified in section 12022.53, subdivisions (b), (c), or (d). (§ 12022.53, subd. (e)(1).) Here, the jury found three section 12022.53, subdivision (e)(1) allegations true as to Kessee. Because this enhancement depends on a finding pursuant to section 186.22, subdivision (b) (§ 12022.53, subd. (e)(1)(A)), the changes to section 186.22 made by AB 333 require that the true findings on these allegations also be vacated and the matter remanded to the trial court.[15] We note that the jury found true three firearm allegations that Jackson personally and intentionally discharged a firearm (§ 12022.53, subds. (b)-(d)). These findings, which Jackson does not challenge, remain intact.

VII.  *Motion to Bifurcate*

Before trial, Kessee moved to bifurcate the gang and gang-related firearm allegations from the murder charge. Kessee contends the trial court abused its discretion in denying that motion. Jackson, for his part, failed to request bifurcation or join in Kessee's motion below, and therefore has forfeited this issue on appeal. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050–1051 [defendant bears the burden to show bifurcation should be

---

[15]  In light of our conclusion, we need not address Kessee's contention that there was insufficient evidence to support the gang and gang-related enhancements. We also do not discuss Kessee's argument regarding the trial court's authority to strike his gang-related firearm enhancements under section 1385.

granted]; *People v. Fuiava* (2012) 53 Cal.4th 622, 653 [issue not raised below is forfeited].)

Below, Kessee argued that the gang evidence had little probative value on the question of guilt and was highly prejudicial. In opposition, the prosecutor argued the gang evidence and the murder were inextricably intertwined. He stated that this evidence was necessary to establish the motive for the murder. The trial court agreed with the prosecutor and denied the motion. The court explained that "[t]he entire motive as described by the People's witnesses, and to some extent the defendants themselves . . . is that they believe this person was a rival gang member." The court concluded that the gang evidence was "inextricably intertwined" with the murder and its admission was more probative than prejudicial.

The trial court has discretion to bifurcate the trial of a gang enhancement from the trial of the substantive offenses. (*People v. Hernandez, supra*, 33 Cal.4th at pp. 1044, 1048–1051.) Bifurcation is unnecessary when the evidence supporting a gang enhancement would be admissible at trial of the substantive offenses. (*Id*. at pp. 1049–1050.) The party seeking bifurcation must " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*Id*. at p. 1051.) "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Id*. at p. 1049.) We review denial of a motion to bifurcate a gang allegation for abuse of discretion (*id*. at pp. 1050–1051), based on the record before the court when it ruled on the motion (cf. *People v. Avila* (2006) 38 Cal.4th 491, 575).

The gang evidence in this case was relevant in establishing a motive for the murder and in helping to identify the perpetrators. Defendants were South Side Compton Crips and the Neighborhood Compton Crips was a rival gang. As noted, Evans testified that Jackson said he decided to drive into rival gang territory for the specific purpose of targeting a rival gang member. Kessee pointed out the victim as the target based on his belief the victim was

a Neighborhood Compton Crips gang member named Ray-Ray.  We conclude that the trial court did not exceed the bounds of its discretion in denying Kessee's motion to bifurcate.

VIII.  *Judicial Misconduct*

Kessee contends the trial judge committed misconduct by allowing his own bias to affect his duties as a judicial officer.  Kessee identifies six instances of alleged misconduct by the court.  Jackson joins in the claim.  We agree with the Attorney General that defendants forfeited their contentions by failing to raise them below.  "As a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320; *People v. Sturm* (2006) 37 Cal.4th 1218, 1237.)

Kessee acknowledges that "no objections were made as to judicial misconduct," but asserts that any objection "would have been fruitless."  It is true that defendant's failure to object may not preclude review where an objection would have been futile. (*People v. Sturm, supra,* 37 Cal.4th at p. 1237.)  But to avail himself of this exception, Kessee must explain why an objection would have been futile; the bald assertion that it would be is insufficient. (*Mayfield, supra,* 5 Cal.4th at p. 196; *Hardy, supra,* 2 Cal.4th at p. 150.)  In the absence of such an explanation, we decline to apply the exception.  This issue is forfeited.

IX.  *Transcripts of the Jail Recordings*

Defendants contend the trial court abused its discretion in permitting transcripts of the jail recordings in the jury room even when the corresponding audio was not being listened to by the jury.  Jackson forfeited the claim by failing to object below.  In any event, we conclude the contention lacks merit.

a. *Relevant Background*

During trial, the prosecutor sought admission of multiple exhibits, including defendants' recorded jail conversation (People's Exh. No. 79).  While the trial court discussed admission of the People's exhibits into evidence,

Kessee's counsel objected to "all of the transcripts for the various recordings." The trial court stated, "I think I've said it five times at least, if not more: The transcripts are not admitted into evidence. They are not evidence in the case." The court further stated, "What I intend to do with the transcripts, because oftentimes jurors annotate or write on them, is I intend to allow them to take them into the jury room, to remind them again that they're not evidence, and to let them know that they should not rely on the transcripts as evidence [and] to rely on the oral recordings." The court noted that "the jury had been admonished on numerous occasions, but there will be another admonishment that the transcripts are not evidence, and that if they need to rely on the evidence of the recordings, they need to listen to the recordings."

In response, Kessee's counsel stated that it was only natural for the jury to just look at a transcript as opposed to listening to a recording over again because it's "just right there at their fingertip[s]." Therefore, the jury "shouldn't get things that aren't evidence." However, counsel understood that if the jury was listening to an audio recording, they would be given the transcripts "at that time." Over counsel's objection, the court said it would allow the jury to have the transcripts, with the proper admonitions. During closing argument, Kessee's counsel reminded the jurors that the transcripts of the audio recordings were not evidence. Prior to deliberations, the court gave the jurors the same reminder.

b. *Analysis*

A trial court ordinarily does not abuse its discretion in allowing the jury to have a transcript to follow along as an aid to a recording, especially where the trial court admonishes the jury that the transcript is only an aid and not evidence. (See *People v. Polk* (1996) 47 Cal.App.4th 944, 955–956.) On appeal, Kessee claims a particular transcript of a jail recording (People's Exh. No. 79-A) "was not believed to be an accurate account of what was said" given the poor quality of the audio. Kessee, however, cites no example of inaccuracy in the transcript that might mislead the jury. Furthermore, the jury was directed by the trial court and Kessee's counsel that they were to rely on the recording, not the transcript, as evidence. (See *People v. Brown* (1990) 225 Cal.App.3d 585, 599, citing *People v. Fujita* (1974) 43 Cal.App.3d

31

454, 472-473 ["[t]ranscripts of admissible tape recordings are only prejudicial if it is shown they are so inaccurate that the jury might be misled into convicting an innocent man"].)  Therefore, we conclude the trial court did not abuse its discretion in allowing the transcripts in the jury room during deliberations.  In light of that conclusion, we need not address whether it was prosecutorial misconduct to introduce the audio recording of the jail conversation and accompanying transcript.

X.      *Evidence of First Degree Murder as to Kessee*

Kessee contends the trial court erred in allowing the prosecutor to present evidence relevant to the first degree murder charge and instructing the jury on first degree murder, after the jury in the initial trial found him not guilty of that charge.

Prior to his third trial, Kessee filed a motion in limine to exclude the prosecution from "presenting evidence of first degree murder" because he was acquitted of the charge in the first trial.  In response, the prosecutor stated that this issue would be "effectively addressed by jury instructions," in that there would "be no instruction on willfulness, premeditation, or deliberation."  Moreover, the evidence to support first degree murder is relevant for a second degree murder charge.  The trial court denied the motion.  At trial, the court orally instructed the jury only on second degree murder.[16]

We agree with the Attorney General that the evidence to support first degree murder and second degree murder is one and the same.  The evidence pertaining to Kessee's activities prior to the murder was directly relevant to prove malice.  On appeal, Kessee fails to articulate any argument to the contrary.  The jury was only instructed by the trial court on second degree murder.  We conclude the trial court did not abuse its discretion in denying Kesse's motion.

---

[16]    While the appellate record includes both CALCRIM No. 431 (first degree murder) and CALCRIM No. 640 (deliberation and completion of verdict forms: for use when defendant is charged with first degree murder and jury is given not guilty forms for each level of homicide), it appears to have been a clerical error in assembling the clerk's transcripts.

32

XI.  *Instructional Error*

Kessee contends the trial court abused its discretion by instructing the jury with CALCRIM Nos. 252, 334, 401, 500, 520, 521, 640, 1401, 1402, and 1403.  We agree with the Attorney General that Kessee fails to provide any substantive legal argument supported by authority for a claim of error related to CALCRIM Nos. 334, 500, 520, 521, 640, and 1402.  Therefore, we decline to consider these claims. (*People v. Mayfield, supra,* 5 Cal.4th at p. 196; *People v. Hardy, supra,* 2 Cal.4th at p. 150.)  As to the claims of error related to CALCRIM Nos. 252, 1401, 1403 (gang-related instructions), we have already concluded that defendants are entitled to the benefit of AB 333's amendments to section 186.22 as their judgments are not yet final.  Therefore, the only remaining instruction is CALCRIM No. 401.  We review an allegation of instructional error de novo.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

Kessee asserts that CALCRIM No. 401 did not require the jury to find that he personally harbored a specific intent to kill as an aider and abettor.  We disagree.  The jury was instructed: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:  [¶]  1. The perpetrator committed the crime;  [¶]  2. The defendant knew that the perpetrator intended to commit the crime;  [¶]  3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;  [¶]  AND  [¶]  4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.  [¶]  Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."  The only crime charged here was murder.  Under CALCRIM No. 401, the jury could not have convicted Kessee as an aider and abettor without finding he knew Jackson intended to kill the victim, and Kessee intended to aid, facilitate, promote, encourage, or instigate that killing—that is, that Kessee also intended to kill.  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 [accomplice shares the specific intent of the perpetrator when he or she " ' "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the

33

perpetrator's commission of the crime" ' "].)  The trial court did not err in using CALCRIM No. 401.

XII.  *Withdrawal of Kessee's Plea Deal*

Before his third trial, Kessee moved to dismiss the case against him pursuant to section 1385.  Kessee's counsel explained that after the second mistrial, the prosecutor presented a plea offer to Kessee, which he accepted. While they waited for a hearing to submit the plea for the court's approval, Jackson was granted a new trial.  Thereafter, the prosecutor withdrew the plea offer and decided to move forward with a third trial.

Kessee challenges the prosecutor's withdrawal of the plea offer before proceeding to retry him on the second degree murder charge.  In the context of plea bargains, " '[t]he prevailing doctrine is that "the [prosecution] may withdraw from a plea bargain agreement at any time prior to, but not after, the actual entry of the guilty plea by the defendant or other action by him [or her] constituting detrimental reliance upon the agreement." ' " (*People v. Rhoden* (1999) 75 Cal.App.4th 1346, 1352.)  Kessee acknowledges this rule but urges this court to "change the standard" by not requiring detrimental reliance before finding that a plea deal is binding on all parties.  We see no compelling reason to depart from the current standard.

There is no dispute that the prosecutor withdrew the plea offer prior to court approval.  Kessee makes no attempt to demonstrate any detrimental reliance.  Most importantly, despite Kessee urging this court to enforce the plea deal, he made no such request in the trial court.  Therefore, we find the issue forfeited on appeal.

XIII.  *Motion for a New Trial*

Kessee argues that the trial court erred in denying his motion for a new trial based on juror misconduct, specifically that one juror improperly relied on a transcript of the audio in People's Exhibit No. 79 in rendering her verdict.

34

a. *Relevant Background*

After the jury returned a guilty verdict, Kessee filed a motion for a new trial pursuant to section 1181 on the grounds that one of the jurors (Juror No. 6000) engaged in misconduct during deliberations. Following the verdict, defense counsel spoke with Juror No. 6000 and an alternate juror (Juror No. 6737). During their conversation, Juror No. 6000 stated that she consistently cast a vote of not guilty during deliberations. However, Juror No. 6000 changed her vote to guilty "after reading the transcripts of the audio recording [(Exh. No. 79)] of the two defendants in the [jail] cell." Juror No. 6000 "expressed she found the transcript[] to be incriminating," but "she could not understand the audio recording." Despite knowing the transcript was not evidence, she relied on it when changing her verdict.

At the hearing, Juror No. 6000 testified that she recalled having a conversation with Kessee's counsel and one or two other jurors. She recalled listening to defendants' jail conversation during deliberations, but not in its entirety "because it was very hard to understand." Juror No. 6000 did not recall reading a transcript of the conversation, but she did recall listening to it. Juror No. 6000 testified the jail conversation did not have any effect on her verdict. Juror No. 6000 did not recall telling Kessee's counsel that the transcript of the jail conversation convinced her to change her verdict. Rather, she testified that the "timeline" of the events changed her verdict to guilty.

Juror No. 6737 also testified at the hearing. She was an alternate juror and did not participate in the jury deliberations. Juror No. 6737 recalled having a conversation with Kessee's counsel and other jurors, including Juror No. 6000. According to Juror No. 6737, Juror No. 6000 stated that on the last day of deliberations, "they played the recording again, and that recording is what made her change her decision." Juror No. 6737 did not recall saying that Juror No. 6000 "changed her mind after reading the transcripts."

After argument, the trial court concluded "that there was absolutely no juror misconduct." The court explained, "Juror 6000 testified openly, honestly. She testified that contrary to the assertions by the defense[,] . . . [s]he essentially corroborated the conclusion that the Court draws, that there was no misconduct." The court stated that "Juror 6000 did not, as asserted

by the defense, solely read the transcripts and rely on the transcripts as evidence," and "both of the witnesses [(Juror Nos. 6000 and 6737)] corroborated each other in that regard." The court denied Kessee's motion for a new trial.

b. *Analysis*

When reviewing the trial court's denial of a motion for new trial based on juror misconduct, we accept a trial court's factual findings and credibility determinations, including as to whether misconduct occurred, "if they are supported by substantial evidence." (*People v. Dykes* (2009) 46 Cal.4th 731, 809; *People v. Tafoya* (2007) 42 Cal.4th 147, 194–195 [finding that substantial evidence supported trial court's finding that no misconduct occurred].)

The trial court properly denied the motion for a new trial because Kessee failed to present credible evidence of any juror misconduct. At the hearing, Juror No. 6000 testified that she did not use the transcript of the jail conversation during deliberations. While she listened to the audio recording, Juror No. 6000 testified that the jail conversation ultimately had no effect on her verdict. Additionally, Juror No. 6000's testimony was corroborated by Juror No. 6737, who did not recall telling Kessee's counsel that Juror No. 6000 "changed her mind after reading the transcripts." In light of the testimony, the court found both jurors credible and that there was no truth to Kessee's allegation that Juror No. 6000 impermissibly relied on the transcript of the jail conversation in reaching her verdict. There was nothing to show that Juror No. 6000 relied on any extrinsic evidence during deliberations. Because there was no juror misconduct, the trial court properly denied the motion for a new trial.

XIV. *Factual Innocence*

Kessee argues that he is factually innocent based on "all the reasons already detailed throughout [his] [b]rief." "There are three classes of persons who may petition the court for a finding of factual innocence. (§ 851.8, subds. (a), (c), (d) & (e).) 'Those classes are (1) persons who have been arrested but no accusatory pleading has yet been filed [subd. (a) ]; (2) persons who have been arrested and an accusatory pleading has been filed but no conviction

36

has occurred [subds. (c) & (d)]; and (3) persons who are "acquitted of a charge and it appears to the judge presiding at the trial . . . that the defendant was factually innocent" [subd. (e)].' " (*People v. Mazumder* (2019) 34 Cal.App.5th 732, 738.)  Neither defendant falls under any category articulated in section 851.8.  Moreover, defendants failed to file a petition for a factual innocence finding in the trial court and they cannot raise this issue for the first time on appeal.  (§ 851.8, subds. (c)-(e).)

XV.   *Verdict Form*

Kessee argues that his verdict form failed to specify the degree of murder.  He asserts that the form was confusing and/or misled the jury. Kessee forfeited this issue by "failing to object to the form of the verdict when the court proposed to submit it or when the jury returned its finding." (*People v. Jones* (2003) 29 Cal.4th 1229, 1259, citing *People v. Bolin* (1998) 18 Cal.4th 297, 330.)

In any event, we reject Kessee's contention on the merits.  There was no need to specify the degree of murder on the verdict form because Kessee was previously acquitted of first degree murder and second degree murder was the only murder charge Kessee was still facing.  The jury was also fully aware of this fact as the court instructed them, "If you decide [Kessee] committed murder, it is murder of the second degree."  In closing, the prosecutor also reminded the jury that Kessee was "charged with murder, second degree murder."  Kessee fails to articulate how the verdict form as written could have confused or misled the jury.  There were only two possible verdicts: guilty or not guilty of second degree murder.

Even assuming the verdict form was deficient, there is no prejudice.  If the jury fails to determine the degree of the crime, the defendant will be deemed guilty of the lesser degree.  (§ 1157.)  Kessee was already found guilty of the lesser degree of murder.

XVI.  *Senate Bill No. 1437*

Kessee argues he is entitled to resentencing relief under Senate Bill No. 1437 (Senate Bill 1437) because he was convicted of second degree murder based on an imputed malice theory.  We disagree.

Effective January 1, 2019, Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) In addition, Senate Bill 1437 added what is now section 1172.6, which provided the requirements and applicable procedure for a person convicted of murder under prior law to retroactively challenge their convictions. (Stats. 2018, ch. 1015, § 4; Stats. 2022, ch. 58, § 10.)

Effective January 1, 2022, Senate Bill 775 further amended section 1172.6 "to provide that a person with a qualifying conviction that is not final may challenge the validity of that conviction on direct appeal based on Senate Bill 1437's changes to the murder statutes." (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865–866, italics omitted; § 1172.6, subd. (g).) Under section 1172.6, a defendant may seek relief if a murder conviction was based on a natural and probable consequences theory, a felony-murder theory predating Senate Bill 1437, or some "other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a)(1).)

The record demonstrates that the jury could not have convicted Kessee of second degree murder on a theory made invalid by Senate Bill 1437. The jury did not receive instructions on felony murder or the natural and probable consequences doctrine. (*People v. Harden* (2022) 81 Cal.App.5th 45, 52 ["if the record shows that the jury was not instructed on either the natural and probable consequences or felony-murder doctrines, then the petitioner is ineligible for relief as a matter of law"].) Instead, the jury instructions required the jury to find Kessee personally harbored express or implied malice to convict him of murder. (See CALCRIM No. 520.) Moreover, in closing argument, the prosecutor argued to the jury that Kesse "acted with express malice" because "he unlawfully intended to kill." The instructions, coupled with the prosecutor's closing argument, show that the jury necessarily found Kessee guilty of murder under a valid theory. We conclude Kessee is not eligible for relief under Senate Bill 1437 as a matter of law.

XVII. *Jackson's Firearm Enhancements*

Jackson contends that the trial court, in imposing sentence, failed to recognize its discretion under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*) to substitute his firearm enhancement under section 12022.53, subdivision (d) with a lesser included firearm enhancement in subdivisions (b) or (c) of section 12022.53.

a. *Relevant Background*

At Jackson's sentencing hearing, the trial court found the following facts in aggravation: the manner in which the crime was carried out indicates a significant amount of planning; Jackson engaged in violent conduct that indicates a serious danger to society; the crime exhibited a high degree of viciousness; and the victim was particularly vulnerable.

As discussed above, the court sentenced Jackson to 25 years to life on count 1, with a consecutive 25 years to life for the gun enhancement under section 12022.53, subdivision (d). The court stayed the gun enhancements under subdivisions (b) and (c), as well as the gang enhancement. The court made it "abundantly clear" that it considered dismissing or striking the firearm allegation under section 1385 but elected not to. Also, the court "made a conscious decision to run the [firearm] allegation consecutive to the murder." The court emphasized that the crime was a "completely senseless act of violence for no reason whatsoever other than you just thought [the victim] was from the wrong gang." The crime was "willful, premeditated and deliberate." The court found the imposition of a consecutive term of 25 years "appropriate."

b. *Analysis*

Section 12022.53 requires the court to impose an additional, consecutive sentence of 10, 20, or 25 years to life for use of a firearm, discharge of a firearm, or discharge of a firearm causing great bodily injury, respectively. (§ 12022.53, subs. (b)-(d).) Effective January 1, 2018, section 12022.53 was amended to provide the court with discretion to strike or

dismiss an enhancement that was otherwise required. (§ 12022.53, subd. (h).)

Under *Tirado*, the trial court has discretion to substitute penalties under section 12022.53, subdivisions (b), (c), or (d) if the facts required within the applicable subdivision were alleged and found true. (*Tirado, supra*, at pp. 696, 702.) The court also has general discretion to impose a sentence for a charged or uncharged lesser enhancement when the facts supporting the lesser enhancement have been alleged and found true. (*Id.* at p. 697.) For example, a court can strike a section 12022.53, subdivision (d) enhancement and impose the sentence outlined under subdivisions (b) or (c), or it can even impose the sentence applicable to the enhancements in section 12022.5, subdivision (a).[17] (*Tirado, supra*, at p. 700.)

This discretion applies retroactively to nonfinal cases (*People v. Chavez* (2018) 22 Cal.App.5th 663). Therefore, the court here could have imposed a significantly shorter sentence for the firearm enhancement had it chosen to exercise its discretion in that manner. Although the court was aware of its discretion to strike or dismiss an otherwise-required enhancement, there was a split of authority regarding the extent of that discretion, which was not resolved until after the court sentenced Jackson. (See *Tirado, supra*, at pp. 697-702.)

Assuming the trial court was unaware of its discretion to reduce his sentencing term, as Jackson claims, remand is unnecessary if " 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have [reduced the] enhancement' even if it had the discretion." (*People v. Franks* (2019) 35 Cal.App.5th 883, 892, quoting *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) That is the case here.

The trial court gave three clear indications that it would not reduce the enhancement term. Specifically, the court (1) found multiple factors in aggravation and none in mitigation; (2) declined to strike any of the enhancements despite knowing the consequences of doing so; and (3)

---

[17] Section 12022.5 subdivision (a) provides for sentences of 3, 4, or 10 years for personal use of a firearm in the commission or attempted commission of a felony.

described its basis for doing so in terms that illustrated its belief that a 25-year-to-life term for the section 12022.53, subdivision (d) enhancement was precisely the appropriate term. It is abundantly clear from the court's comments that, if specially called upon to rule on a request for reduction of the enhancement, it would deny such relief. (*People v. McVey* (2018) 24 Cal.App.5th 405, 419 ["In light of the trial court's express consideration of the factors in aggravation and mitigation, its pointed comments on the record, and its deliberate choice of the highest possible term for the firearm enhancement, . . . remand in these circumstances would serve no purpose but to squander scarce judicial resources"].)

XVIII.     *Racial Justice Act*

Kessee argues that he suffered discrimination based on his race in violation of the Racial Justice Act (RJA). Jackson joins in the argument. Because we are reversing the gang and gang-related firearm enhancements, and remanding for potential retrial on those enhancements, we need not reach the merits of the RJA claim in this appeal.

" 'The Legislature enacted the [RJA] with the express intent "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." ' " (*Sanchez v. Superior Court* (2024) 106 Cal.App.5th 617, 628.) The statute prohibits the state from seeking or obtaining a criminal conviction or seeking, obtaining, or imposing a sentence on the basis of race, ethnicity or national origin. (§ 745, subd. (a).) And prior to entry of judgment, the statute provides " 'a comprehensive procedure for making and adjudicating a section 745 motion at the trial level.' " (*People v. Howard* (2024) 104 Cal.App.5th 625, 657; § 745, subd. (c).) Thus, where a judgment is reversed on appeal for independent reasons, an appellate court need not address the merits of an RJA claim because the defendant "may on remand raise his . . . RJA claim to the trial court, should he choose to do so." (*Id.* at p. 658.)

Given our conclusion that defendants' judgment must be reversed, in part, we believe it is the better course to permit defendants the opportunity to raise the RJA claim with the trial court in the first instance and develop a

full record on the matter instead of addressing the merits for the first time on appeal.[18] We express no opinion as to whether defendants are entitled to relief under the RJA or what remedy might be appropriate if defendants ultimately prove any alleged violation.

## DISPOSITION

The jury's findings on the sections 186.22 and 12022.53, subdivision (e)(1) enhancement allegations are vacated, and the related sentences thereon are stricken. On remand, the prosecution shall have the option to retry both defendants on the section 186.22 enhancements and Kessee on the section 12022.53, subdivision (e)(1) enhancements. After the status of those enhancements is resolved (either by no retrial or by retrial and final resolution), the trial court shall resentence. Defendants may also file a motion for relief under section 745, should they choose to do so. The judgment is otherwise affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ZUKIN, P. J.

WE CONCUR:

MORI, J.                                    TAMZARIAN, J.

---

[18] While a party is permitted to raise an RJA claim for the first time on appeal for claims based on the trial record (§ 745, subd. (b)), a motion brought before the trial court potentially provides the parties with a more robust opportunity to develop a record on the issue with a full evidentiary hearing in an adversarial context (§ 745, subd. (c)). In fact, the statute specifically contemplates that even when an RJA claim is raised after entry of judgment, it may be more advantageous to stay an appeal and remand the issue to the trial court to consider an RJA motion in the first instance. (§ 745, subd. (b).)